Good morning, Your Honors. Mark Rifkin on behalf of the Appellants. If I may, I'd like to reserve four minutes for rebuttal. The clock counts down. Okay. Thank you. The Appellants were participants in two retirement plans that were offered by Amgen and its subsidiary, Amgen Manufacturing, that permitted but did not require investment in Amgen Company stock as a retirement option. Instead, the plans placed upon the fiduciaries the burden to exercise their fiduciary duty and decide whether the plans would offer that stock, and if so whether the plans would withdraw that stock or limit the amount that could be saved by the participant with Amgen stock. At no point in time were the fiduciaries under any obligation by virtue of either plan, which were identical in this regard, were they under any obligation to offer company stock as a retirement savings option. How about encouragement? I mean, the test may be obligation or encouragement. I agree, and I think this plan was as neutral as neutral could be. So I think the answer is no. Your Honors, this case gives the Court the perfect opportunity to define the outer limit of the presumption of prudence that was recently adopted by the Ninth Circuit in the Kwan v. Computer Sciences case in 2010 when the Court said that the purpose for the presumption is because it protects fiduciaries when plan terms, and now I'm quoting directly from the decision, when plan terms require or encourage investment primarily in company stock. In the lower court, the defendants conceded that that was not the purpose for this plan. They said it black and white in the lower court, and that is in fact the case. This plan was as neutral a plan as any plan could be, and in fact it is rare among plans because it does two things. First, it says only that company stock may be offered, and then it says a second thing. It says if you choose to offer company stock, you may terminate that fund at any time or you may suspend future contributions into that fund at any time, and that combination of those two provisions, those two very clear provisions giving these fiduciaries complete discretion at any time to pull the company stock as an investment, to suspend company stock as an investment, or never to have offered it at all. It was only one of two dozen investment options that were listed as possible. Did you find any case in your research where a company had refused to buy its own stock? Your Honor, there are very few large public companies that do not offer it. I didn't find a one. Only because if there were such a case, it wouldn't make it into the courts because there wouldn't be a complaint that it was company stock that was offered. What you're suggesting is the company should, regardless of the risk, refuse to buy its own stock if it had any information to indicate that the stock was going to drop in value. No, not at all, Your Honor. What I'm suggesting is that the fiduciaries of these plans who are appointed to exercise the highest duty known to the law, a fiduciary duty to act solely in the interests of plan participants, when they are merely permitted to offer company stock as an investment, and when they are specifically told you may withdraw that offer at any time, you may suspend future contributions into that plan at any time, we expect those fiduciaries to fulfill the highest duty known to the law, their fiduciary duty. And this case, the facts in this case about the weaknesses that were inherent in Amgen, compare far more favorably to other cases. In fact, one decided by this court, the Syncourt case. Should they have divested? Let's assume they own some of their own stock. Is it your view that they should have sold theirs, just dumped it? Well, dumped is a bit of a pejorative word, Your Honor, but I believe that, yes, there was an opportunity for them to sell the stock before the truth became known to the market that Amgen was unlawfully marketing to drugs. If they dumped their own stock for the truth to be known to the market, would it? Well, no, Your Honor, it wouldn't be. And this was part of the problem we had with the district court's opinion. The district court speculated at least twice about what the effect would have been if these fiduciaries had acted upon their fiduciary duty. In the first place, the court speculated. If I understand, I'm having a little trouble with your exact theory that they should have not offered among 25 plans, they should have withdrawn the Amgen plan. That's your theory? The Amgen fund, that's right. They weren't really selling Amgen stock. Correct. But, I mean, this gets muddled occasionally in your briefs, so they would have had to essentially have made an announcement that they are no longer permitting their employees to participate in a fund which sold Amgen stock. They are no longer allowing the participants to save for their retirement through that fund, but they could have done a number of things. One of the things that they were... And that you needed an expert to tell you would not have raised concerns in the market that might have resulted in a decline in the stock. Well, and I think at trial it would be our burden to offer proof that that would in fact be the case. But I want to more clearly answer your question. The plan gave them the right to withdraw the fund. If they had withdrawn the fund, they would not have had to await any other action to transfer the money that was invested in the stock fund into the one mandatory fund, the Fidelity Freedom Fund. And so it would have happened automatically. The money that had been saved in the Amgen stock fund, in that plan investment... But that fund owned Amgen stock, I assume. So you not only wanted them to withdraw the fund as an option, but also to sell all the stock in the fund. Correct. Those shares would have to have been liquidated, and then the proceeds from the sale of those shares would have been reinvested. We think even without any other action, it would have been reinvested automatically in the Fidelity Freedom Fund. Is there something in the complaint? Because we don't really have a record here. This is a 12-B6. Was there something in the complaint that tells us how much stock was in the Amgen fund? Yes. If we're going to sell that stock, what's going to happen? How much? What the plan alleges, I believe, and I don't know the number exactly, but I believe there were approximately 4 million shares of Amgen stock. Out of how many shares outstanding? 100 million or more. This was not a large portion of the float of Amgen stock. But Your Honor's question is one that's directed more toward either summary judgment or trial. It's certainly not the kind of speculation that the court should have made... Let me ask you a different question. I'm assuming for the moment that we're not operating under the Kwan presumption of prudence. I don't know how to pronounce that second, the munch. Munch. Is it munch? Okay. So assume we're acting under the prudent person standard, the one that you're arguing. Yes, Your Honor. Which of the fiduciaries, if any, had an obligation under the securities laws, an independent obligation, to reveal material information that would have affected the stock price? The board of directors, all the members of the board of directors, were also fiduciaries. And so they had an obligation to disclose this information to the public. And in fact, they are all defendants in a securities case that the district court denied a motion to dismiss him. Where I'm going with this question is, ordinarily the prudent person standard allows the prudent person to rely on the publicly available information, requires them to take the publicly available information into account. And when the fiduciary is investing in the stock of his own company, he cannot rely on inside information because that would be basically insider trading. On the other hand, if that same fiduciary is in a position of being required to reveal information, that is not inside information. That is information that is unlawfully concealed. So I'm trying to figure out if the fiduciaries were at the same time fiduciaries operating under an obligation to the planned participants, but also operating under an obligation to reveal information. Because if that's so, to the extent that they're not revealing that information to the public, they are also violating their fiduciary duties to the participants in the plan. That is correct. Have you pled that? Yes, we have. One of our claims was that the fiduciaries also did not properly and appropriately communicate to the planned participants this adverse information, so that the planned participants could have acted in their own behalf. But just to be clear. They were obligated to reveal that information independently of their fiduciary obligation. That's to get around that very real problem of insider trading. Well, I'd like to come back to that question about insider trading, but the answer to your question is all of the members of the board, including the president and CEO of the company, Mr. Scherer, all of them had an obligation to make disclosure under the federal securities laws, as well as an obligation to make disclosure under ERISA, and they all failed to do so, and that's why they're subject to this litigation as well as... I have a problem with the case insofar as you're saying that they had an obligation to reveal to the planned participants information about what the stock price ought to be, if that information was not going to be revealed to the general public. Because at that point, we're talking insider trading. Number one, I'm not making that assertion. Okay. And number two, I do want to address the insider trading question, because it troubled the court, and I troubled the district court, that is, and we have a number of responses to make to it. In the first place, we're not saying that any of them had to, in fact, violate the federal securities laws, but one possibility could be that they had made timely disclosure and then taken this action, and then we would have seen what timely disclosure would have done to the price of the stock. But more importantly... You're not suggesting that if they had made, in your brief, you say they should have disclosed it to the world, and that would have done away with this question of insider trading, but that would have caused the stock to decline. Well, it may have caused... I mean, you don't need an expert for that, do you? It may have caused the stock to decline, but it may not have caused the stock to decline 30%, because the market may have had more faith... There wasn't a drop of 30%, and you're relying on various different kinds of adverse events that affected it. The last one was a 9.2 decline when I think the Securities Exchange Commission took some action. But that's only because the information that did come out and that was eventually disclosed to the market didn't come out all at once. It came out in pieces over a period of time. But each disclosure had some effect on the market, and what we believe the evidence would show at the trial is that a responsible disclosure would have been more favorably viewed by the market. They would not have lost the kind of confidence in management that they did lose when the market found out about this as the result of governmental investigations. Within a year after the close of the class period, the stock increased by 29%. At least that's what they say in their brief. And that's what they say in their brief, and respectfully, that's what trials are all about. But I do want to... You mean there's an issue of whether it increased by 29% from 2007 to 2008? No, I think the question of fact is what would have happened to the stock in this plan either had they sold the stock, number one, or number two, had they disclosed, timely disclosed to the plaintiff participants and presumably to the market, what the adverse facts were. They have a great... I just want to get something clear with respect to Judge Fletcher's question. Was their obligation to disclose to their employees any different than their obligation to disclose to the general public? In terms of the material... The market, when I say the general public. In terms of the material that they were obligated to disclose, the facts that they were obligated to disclose, no, I don't believe so. But in terms of the hierarchy of duties, this court has said, among others, this court has said that the fiduciary duty that's owed under ERISA is the highest duty known to the law. And so we would say if you had to rank the duties, the fiduciary duty that's owed under ERISA and compare it with the disclosure duty that's owed under the securities laws, that if you had to prioritize one, you would say that the fiduciary duty under ERISA is a higher duty. It's called the highest under the law. That may be so. But theoretically, but with respect to this particular information, they were not obligated to disclose it to the public as much as they were to disclose it to their employees. In this case, the information was the same. The adverse information was the same. So they were under the same obligation to disclose. Correct. But I do think that the hierarchy of the obligations is relevant to this question of insider trading. I'd like to point out a few things. First, in Quan, when the court addressed this question of insider trading, if the court had decided that it was an immunity, that the duty to refrain from insider trading is so great that there can't be any way around it, the court wouldn't have adopted the presumption, which the court says protects the fiduciaries from engaging in insider trading. It would have simply created an immunity. Number two, no one is suggesting that the fiduciaries should have violated the securities laws. Rather, what we're saying is that they're liable for having failed to take action. Let me ask you this. Let's assume for the purposes of my question that the obligation on the part of the company and the obligation on the part of the fiduciaries to reveal information relevant to the stock price is the same. Okay. You're arguing that it's higher for the fiduciaries, but I'm saying let's assume for the moment that it is the same. Okay. And let's assume that, and this is not factually established, but let's assume that there was material information that should have been revealed under the securities laws, but that was not. Correct. Let's assume further that there was damage as a result if we're suing under the securities laws, which I gather is the subject of another lawsuit. Assume all of that and assume that there was an obligation to the fiduciaries to reveal exactly the same information that there was an obligation to reveal under the securities laws independently. Is there any greater recovery under ERISA as a consequence of that than there would be under the securities laws? Yes, there is. Because? Because the measure of damages under ERISA pursuant to a case called Donovan v. Beerworth from the Second Circuit is to measure the difference in the actual loss in the company stock versus what the gain would have been in a more prudent investment. So, for example, if you lose $10 on company stock and would have gained $1 or $2 or $3 in a money market fund, for example, then the measure of damages is not $10, not the loss in the stock, but $11, $12, or $13. $10 plus $1? Correct. That's number one. Number two, obviously, there's a completely different pleading and proof standard under the two statutes. So I think the chance of recovery is much different. You didn't satisfy the pleading standard. And I do. The other case, I gather, survived the pleading standard. It did. And the Court, on the same information, the Court concluded. I don't think pleading standard is going to be an issue. I see that I may have exceeded my time. I'm happy to answer any more questions the Court has, and I don't know if I have any rebuttal time, but I do appreciate this. Well, this is an important and interesting and somewhat difficult case. We'll make sure everybody has enough time to say what they need to say. Can I ask you one question? Of course. The disclosure in 2005 was simply that they were engaged in selling off-label. The first disclosure, I believe, was that they were engaged in some off-label sales. That's right. But, of course, it's not illegal. The doctors are perfectly free to write prescriptions off-label. It's not illegal for doctors to write off-label prescriptions, but it is illegal for a company to promote the sale of its drugs for off-label use. The Food and Drug Act does not allow that. But the mere fact that a certain percentage of their sales was off-label doesn't tell you whether it was doctors writing prescriptions on their own or whether it was a result of marketing. It was not until later that it was disclosed that the company was being investigated for promoting those off-label sales. That's right. So the disclosure of off-label prescription is somewhat neutral. It's the company's involvement in that process that makes it significant, just like it was when the Ninth Circuit reversed the grant of summary judgment in a prudent man case in Syncor, because the allegation was that the Syncor's foreign subsidiaries were paying bribes to doctors and hospitals to use Syncor's products and services. And that's what makes it unlawful, because it's an unsustainable business practice. There it violated the Foreign Corrupt Practices Act. Here it violated the Food and Drug Act. But the consequences are the same. It's unsustainable until they get caught. I'm sorry? I suppose it's unsustainable until they get caught. Like anything else. Like anything else. The crime is only a crime once you're caught. Let's hear from the other side, but we will give you a chance to respond. Thank you, Your Honor. Thank you, Judge Fletcher. Robert Davis for Appalese, and if it pleases the Court. Let me first go to the question raised by Judge Ferris about company stock. Judge Ferris, your point is exactly right on from my point of view. Congress encouraged companies to offer employer stock. I am aware of no cases which pose the situation you asked about. Indeed, because Congress said going back at least to 1976, we are exempting companies and their plans from the diversification requirement in order to promote the offering of company stock. Second, I would ask the Court to refer to pages 1512 through 1535 of our supplemental excerpts of record. Hang on a second. I just happen to have. Thank you, Your Honor. I'm sorry. I have. What page is that again? That is 1512 through 1535 of our supplemental excerpts of record. Hang on a second. Volume 6, tab 22. 1512. I'm there. Okay. Thank you. Your Honor, you will see that that chart shows all of the mentions of the company stock fund in the various plan documents for the Amgen Plan and the Amgen Manufacturing Limited Plan. It's very clear here that the company as plan sponsor, not the fiduciary committee, writing the plan as settlor said, we want to have a structure here where our employees, through their retirement accounts, can invest in company stock. So, therefore, there are special rules about designating a company stock fund, providing special rules about maximum contributions, prescribing rules for transfers in or out. The chart speaks for itself. The reason that I refer to that, and, again, to go back to Judge Ferris' point, is that one of the cases that we cite in our answering brief at 32 is from the Southern District of New York, Herrera v. Wyeth, where the district court there had exactly that, seen this detailed structure of plan provisions created by the company, not by the committee, and concluded that even where the plan does not explicitly require offering employer stock as an investment option, references to a stock fund presume the existence of that kind of fund and its offering to participants. So what? So the point is, Your Honor, that the standard under Kwan and Wright, Munch, et cetera, is require or encourage. The focus is whether the fiduciaries, not the participants, are being encouraged. This is showing that the company is, if you will, encouraging the inclusion of this in the plan. Also, I'd like to note something, which I think- There are various levels of encouragement. I mean, if you're setting up the initial plan, are you encouraging the purchase of company stock? Or once you've set up the plan with one of the options for the employees to purchase company stock, once you've set up the company stock option as one of the options, is then the purchase of company stock encouraged? That second point, I think, is irrelevant. The first point is the one that matters, that is to say, as you're setting up the overall plan that allows the employees to invest in a lot of different vehicles, at that point is there a requirement or an encouragement to purchase company stock? Indeed. What is there to show us that at the initial stage of setting up the various investment vehicles available to the employees, that at that point the plan either requires or encourages purchase of company stock? Your Honor, we look exactly at the language of the plan and to the pages from the supplemental excerpt of the record that I mentioned. There is the company saying- There are a lot of pages there. Usually, if it's an encouragement or a requirement, the language can be pretty compact. What precise language is there? I would point to examples like this. First, for example, supplemental excerpt of record 465, identifying how- You're after a different page now all of a sudden. I'm sorry. Within the page range, I'm going to a different page range. I apologize. Yes. So where am I supposed to go? Supplemental excerpt of record 465, for example. Okay. Hang on, hang on. 465? Correct. I apologize. No, no need to apologize. What I'm now doing, Your Honor, is moving to the actual plan language itself and not the summary chart, which I directed the Court's attention to previously. 465. I'm sorry. I'm the slow one. Typically, that's true. You guys are fast and I'm slow. Okay. I'm on page 465. Okay. In paragraph 17.5, it identifies how company stock would be voted. That is the clear, if you will, interface of the- So let me orient myself. What am I looking at? What you're looking at is the Amgen Manufacturing Limited Plan. There are parallel provisions in the Amgen Plan. And how that actually implements, it's the actual plan language itself, how it implements company stock. And is this the relevant plan or is this the Puerto Rican plan? This is the Puerto Rican plan. There's parallel language in the Amgen Plan. So you're representing to me that if I were to look at the Amgen Plan, that would be relevant? Absolutely, Your Honor, and I can provide parallel page sites. Let's go to that one because, as I understand it, the Amgen Manufacturing, they're not fiduciaries, correct? The AML people are not fiduciaries. No, I believe that the court held- So if you could point me to the relevant plan, I'd appreciate it. Exactly, Your Honor. Then as to Amgen, I believe that the relevant pages are Supplemental Record 334 and 335. 334, okay. Okay, I'm with you. And, Your Honor, what you will see there are- So where's there? Okay, I apologize. I'm going to pull up my copy of it. So you will see, for example, on 335- Oh, on this, yeah, okay. If you go down to the bottom of the page, it talks about transfers into the company stock fund. There are several other provisions about the company stock fund. Okay. What language? Give me a precise- It says, transfers into the company stock fund at the very bottom of 335- Shall be limited. Shall be limited so that- Seems like it's discouraging. Now, actually, Your Honor, what it's intended to do is to say, participants, we don't want you to have more than 50% of your retirement assets in company stock. That is really intended as a protection against risk for participants. Find me some encouraging language. Your Honor, there's no exhortative language here. There's nothing that says we affirmatively encourage our participants to invest. Can I ask you, this all goes to the issue of whether the Munch presumption applies, whether they encouraged or required. Correct. But it strikes me that after a while, when there's so much discretion, it almost becomes irrelevant. In other words, in Kwan, the panel said a guiding principle, however, is that the burden to rebut the presumption varies with the strength of a plan's requirement that the fiduciaries invest in employer stock. For a directed trustee, that is one who is required, there is a lesser degree of judicial scrutiny. While the more discretion a fiduciary has to invest in the less risky holdings as necessary, the more his discretion will be subject to judicial scrutiny. So as I see it, the less discretion, the greater the burden to overcome the presumption. And that makes sense because he's required essentially to do it, and you don't want him to be caught between, just to use the vernacular, between a rock and a hard place. But as you go down and he has greater and greater discretion, the less is required to rebut the presumption. And so when we get to a case like this, where notwithstanding this language you've quoted, there is clearly absolute discretion. It's almost like you're back to the normal presumption. Isn't that true? Your Honor, I actually think that Kwan itself answers that at 623 F3rd at 883. But that's where I was reading from. Exactly, Your Honor. And the Court does note, I think some people have talked about it as a sliding scale. Right. And so does the Second Circuit, which followed Kwan. Exactly. They made that very point as well. Exactly. But when the presumption attaches, and Kwan finds that it attaches under either required or occurred, the Court said in any event referring to that sliding scale language, quote, the Munch presumption would be difficult to rebut. Now, we have a lot of guidance from the Courts, including Kwan, about exactly the kind of facts that would have to be alleged to overcome the presumption. And I think we can see, for example, in Kwan, this Court cited cases in footnote 12 from the Kirschbaum case in the Fifth Circuit, giving extensive examples, an ill-fated merger, a reverse stock split, a 75% drop in stock price, quote, company-wide financial woes, an 80% drop. Those factors are listed at length. Look, I'm not suggesting that you lose under the prudent person standard, but I think, you know, I have to say, speaking for myself, that I'm not very persuaded either by your argument as to why there's this encouragement. And I think that on the sliding scale, you're basically on the bottom of the sliding scale where you're back to the prudent person standard. And if I were you, I would concentrate, at least from my perspective, on why you don't violate the prudent person standard. Well, Your Honor, let me then speak to the prudent person standard because we have Judge Gutierrez, who decided this, dismissed on an alternative basis, both as to the presumption and as to the prudent person standard. First, as the District Court recognized, Section 404 of ERISA, which has the prudence requirement embedded in it, is about prudence. It doesn't require prescience. We look at the fiduciaries, what they looked at at the time, what they concluded. Indeed, there is the risk, as we see from the W.R. Grace Company from the First Circuit, W.R. Grace Company case from the First Circuit, that the fiduciary who makes the decision today to divest the stock is at risk from claims from the participants when the stock later rises. Judge Corman, as you noted, stock price subsequently has increased. That is the risk of hindsight, and not suggesting, Judge Corman, that you're suggesting our position is hindsight at all. But you look at the position, what they knew at the time, and you can see how much of a risk it is. And so that's the first thing. Second, let me very quickly go to – so let me then look at what was the publicly available information at the time. And as you say that, realize I'm about to ask you, what about the information that wasn't public that potentially should have been public based on the securities laws? We'll come to that. Well, actually, Judge Fletcher, I can go to that directly as part of making my point. The reason that we have disclosures by the company in issue here at all is not due to RISA. It's due to requirements of the securities laws. Specifically, and this is summarized in SEC release number 6867, which is codified in 17 – excuse me, 17 CFR 230.428. The SEC tells companies if you're going to have employer stock offered to participants, you need to include references to it in the materials you give to participants. That's the summary plan description. And you incorporate your SEC disclosures by reference, and you refer your participants to those disclosures if they want information about the company. You're not getting to the point that interests me, though. The point I'm making is let's assume – I'm not asking you to concede, of course, and there's no reason you should concede – but let us assume that Amgen should have, under the securities laws, revealed some information to the investing public and that they violated the securities laws in not revealing it. And I understand that's the subject of a separate lawsuit, right? Let me start this way. Are some of the fiduciaries in this case people or entities that should have revealed that information under the securities laws? Your Honor, I don't think so. There is the fiduciary committee, which had the obligation to make ERISA disclosures. Is Amgen itself a fiduciary? Amgen was found by the lower court not to be a fiduciary because – I do not think that's what the court found. I believe that the court found that – let me quickly turn to something else – is that under the Amgen plan, reviewing the performance of the investment funds and picking the investment funds was delegated to the fiduciary committee. Yeah. But if you look at the top of that same page, Judge Gutierrez writes, Amgen apparently delegated. The word is apparently. And we're on 12b-6. I do not think that's a finding. Your Honor, I think that what the court – And, in fact, I want to say that your brief mistakenly says not only that there was a conclusion, but it says that this court, that is to say that we did, which is not true. The only thing you got is out of the district court. And you bury it at the very back of your brief. You say the wrong court said it, and then you misrepresent what the court said. I apologize, Your Honor. I apologize. But I don't find – I don't see any finding by the district court that Amgen is not a fiduciary. Okay. So let's assume for purpose – again, you don't have to concede. Right. Let's assume that we have entities or people who are defendants in this case who are simultaneously fiduciaries and have an obligation to disclose under the securities laws. What then? Your Honor, first, they would have an obligation under the securities laws to make their statements and would be held accountable for those obligations under the securities laws. And you've noted there's a parallel case. Second, ERISA, as compared to what the SEC telling fiduciaries to do to comply with the securities laws, ERISA requires disclosures about benefits. As we go back to the cases that look about disclosures, both affirmative disclosures and the need to avoid misrepresentations, stems from the Supreme Court decision in Verity in 1996. There the company was both the company, the corporation, and the plan administrator. There the company, as company and plan administrator, is telling people, go work for the spinoff entity. Your benefits will be protected. In fact, they weren't. They misrepresented that. Separately, to allege misrepresentation, plaintiffs must allege detrimental reliance. Let me back up a little bit. Putting to one side the detrimental reliance question, which may or may not be fatal to plaintiffs, it seems to me fairly obvious, but you can try to talk me out of it, that if the fiduciary has an independent obligation, for example, because it is the company or because it is some other employee of the company that has the obligation, to disclose under the securities laws, that it should, as a fiduciary, have at a minimum that same obligation towards the plan members. Do you disagree with that? Your Honor, I would agree with that in the sense, which is the SEC tells plan fiduciaries, send people to your corporate filings. Indeed, in the Citigroup. I think the answer is yes or no. You can say yes or no. Your Honor, on that basis, then, I would say yes. That means, then, that if a fiduciary had an obligation under the securities laws to disclose and violated that obligation, it has also violated its obligation towards the plan participants. Your Honor, not necessarily. In the Citigroup. You said yes, but now you can say no. Your Honor, then, in that version, I will respectfully try to change my answer to no. The reason that I do that is that in the Citigroup decision from the Second Circuit, we had a very similar question. You have the SEC disclosures, and then you separately have the plan fiduciaries speaking to people. And the Second Circuit says there that, and I want to give you a page slide, if you can bear with me just for a moment, that the Second Circuit says that really what you do is look to the corporate disclosures, and we don't require plan fiduciaries to do an independent investigation of the corporate disclosures. So the route takes you. But you've moved off of my premise. My premise is that this person or entity is at the same time a fiduciary and someone obligated to make the disclosure. Then, Your Honor, if, and there is a division of authority on this, I don't believe this Court has ruled on it. Quan noted the issue but did not decide it. It is when does, if you will, a corporate communication or an SEC communication become an ERISA communication. Or a failure to communicate, which is the problem here. Or a failure, either a misrepresentation or an omission, although this Court in the Acosta case defined what the affirmative duty to speak is. But really when you look at the duty either voluntarily, affirmatively to speak, or to avoid misrepresentation, if that becomes an ERISA duty, and that is not decided by this Court previously, then ERISA liability would attach. Again, the SEC tells people, tells planned fiduciaries, send your participants to look at our disclosures. That is what Citigroup recognizes. We speak to our people, to our employees, about the company through our disclosures. Your Honor, I believe that I have overstayed my time, although I have been frankly trying to more engage the Court than anything else. You have been responding to our questions. Okay. Any further questions from the bench? Good. Thank you. Thank you. I will try to be brief, Your Honor. First, I would like to direct the Court to paragraphs 86 and 95 of the ERISA. And then I would like to direct the Court to paragraph 86 of the complaint in which we allege that What pages am I looking at? Your Honor, forgive me. I don't have the page references in the record. Okay. Hang on a second. What paragraphs are there? Paragraphs 86 and 95 of the complaint. Okay. I've got 86. It's on page 150 of the volume 2 of the excerpt. Okay. 86. And in paragraph 86, we allege that the company's SEC filings were incorporated by reference into the Amgen plan communications, and then we quote that language there where the communications are incorporated by reference. And in paragraph 95, we make the identical allegation for the AML plan, and we quote again the incorporation by reference language from the AML plan communications. I really don't think that this should be much of an issue. I'd also like, while we're looking at the complaint, I'd like to direct the Court's attention to paragraphs 285 through 287. Your adversary doesn't even contest that. I understand the significance of it. He says that their fiduciaries wearing their fiduciary hat, that's what they had to disclose. So they incorporated by reference the SEC disclosure, but they're not responsible or obligated to do anything more. Judge Corman, there is a line of cases. As a fiduciary as opposed to someone having an obligation on the part of the corporation to make disclosure to the SEC. And there is a line of cases. That is discussed in the briefs where when that incorporation by reference is not made, courts consider whether the original SEC communication was made in a corporate or fiduciary capacity. And those courts conclude that the SEC filing that's not incorporated by reference in plan communications may not expose ERISA fiduciaries to ERISA liability. But it's not an issue here because of the incorporation by reference. The Court had asked some questions about it. I just wanted to provide the reference to the record. You just cited a case. Can you give me that case reference again? I didn't cite any cases. I said there is a line of cases. There are a number of cases that are discussed in the briefs. Okay. Give me one or two. Sure, Your Honor. From the defendant's brief? I don't care where they come from. The defendants talk about in their brief, they talk about this question of whether they made these communications in their fiduciary or corporate status, and they talk about what hat they were wearing. Just give me a moment and I'll find it. Okay. Yes, beginning on page 44 of their brief, they cite Baker v. Kinsley. They cite Citigroup, which they mentioned here, and I'd like to address the Citigroup issue. They cite Avaya, and they cite a case called Dudenhoffer. Okay. That's enough. Citigroup, the Citigroup case was an odd one because what the Court said there is that the fiduciaries have no independent obligation to investigate the accuracy of Citigroup's financial statements. And in the absence of any warnings or suggestions that there's something amiss, they may not have to hire their own accountant or auditor to audit Citigroup's financials. They can rely on the truth of the financial statements. But here, as I said before, the defendants who were responsible for the same directors, who were responsible for the communications to the shareholders generally, the Board of Directors, including the company's CEO, Mr. Scherer, they are also planned fiduciaries. And that's where I wanted to go next, which is to address the Court's question about whether Amgen itself is a fiduciary. And what I'd like to say is this. The court, the district court, erroneously concluded that Amgen was not a fiduciary. I don't think it heard me. They did not conclude. The district court said apparently had delegated. Now, if they had delegated, I think it would no longer be, but the district judge used the word apparently. And in that regard, I'd like to direct the court to paragraph 46 of our complaint, where despite the court's inference, we allege exactly the following. The Global Benefits Committee was never appointed by the Board of Directors. And then it says under the Amgen plan, if the Global Benefits Committee has not appointed, if the Board has not appointed the Global Benefits Committee, then they will act in its behalf. And elsewhere in the complaint, we allege that all of the actions that were undertaken pursuant to the plan terms were undertaken by those individuals, the members of the Board and the fiduciary committee. Here's my problem with this case. And you've been hearing me struggle with it. I'm assuming for purposes of the question, as I've been assuming along here, that there's been a violation of the securities laws, which, of course, has not been established. That may or may not turn out to be so. And I'm also assuming that we have as defendants here either people or entities or both who are fiduciaries under ERISA and who are also obligated under the securities laws independently to make disclosures. I'm trying to figure out whether they can keep separate those two capacities in a lawsuit brought against them as fiduciaries, whether they can say, well, as a fiduciary, I had no obligation to reveal the information that I had an obligation to reveal under the securities laws. That's not this case. Do we have a case law that says they get to separate those two capacities, or do we have any case law that speaks to the question at all? I don't. Other than, like I said, the division between the cases that say that if the corporation makes a communication, that's not also a planned communication. In other words, not the case here. There are some cases that the defendants have discussed that say, in that case, we won't hold them to breaching their fiduciary duty. But they're irrelevant here because the company and the directors are defendants in both cases. I can't imagine a situation where they would be required to make the disclosures to the public, then incorporate those defective communications in the planned communications and somehow not have the same obligation to make communications to the planned participants. So, no, I just don't think it's relevant here. And then, finally, Your Honor, on this question of prudence, you know, we cite the Syncor case, which the district court never ‑‑ this court's the Ninth Circuit Syncor decision, which the district court never addressed. The facts in Syncor and this case are eerily parallel, with one exception. Here we had a 30 percent decline in the price of the stock, and in Syncor it was only a 10 percent reduction in the merger consideration. It went from 0.52 shares of Cardinal to 0.47 shares of Cardinal when the truth about the bribes came out. Here we had a 30 percent reduction in the price of the stock. And we also ‑‑ For a long period of time when different kinds of events or information was made public. The same thing happened in Syncor, Your Honor. The disclosure of the foreign corrupt practices in Syncor took place over a period of time while a merger was under consideration, but before the final merger price was determined. So in the sense that it evolved over a period of time, the exact same facts were present in Syncor as were present here. And in addition, Your Honors, we would refer the court to two cases from the district court in New Jersey, the Shearing Plow case and a companion Murk case, which involved basically the same drugs and a clinical trial, very much like this case does. And there we have, again, we have a decline in revenue as a result of the failure of these drugs to gain FDA approval. We have a congressional investigation. We have an FDA investigation just as we have here. These drugs had FDA approval. In fact, the FDA approval was never withdrawn as I understand it. There were simply, you know, requirements about what kind of notice had to be given and other changes in what could be described as on-label use. Right, not approval. So these were never withdrawn from the market. And what you really had is, of course, looking at it retrospectively, was a kind of a temporary depression in the price of the stock and ultimately from which it recovered. So as of what point do you, to get back to the issue that you, at what point do you calculate damages from? You say, well, that would have been stupid for them to have sold it in, let's say, in 2007 because in 2008 it went down and went up 29 percent. Now, of course, I assume with the rest of the stock market it tanked in 2008, but it's back up to where it was before, if not higher. I didn't look to see what Amgen was selling at. And, Your Honor, respectfully, there's no clear answer to the question when you calculate the damages, number one. Some courts say you calculate the damages within a reasonable period of time after the breach, and other courts say you wait until a reasonable period of time before trial. I can't answer that question definitively, but what I can tell you is it is a, that measure of damages is a quintessential question of proof, not of pleading. We've alleged that there was harm. We should be given the opportunity to proceed with the case. I was just going back to the question that Judge Fletcher asked, and you answer in a long footnote in your brief about what the difference is between the securities laws and the standard of prudence under ERISA. Yes, and of course there is a difference in the measures of damages. We don't know what exactly a prudent investment would have earned for these shareholders because we haven't yet looked at it. Well, we don't even know that this still wasn't a prudent investment, and if you look at it from the standpoint of a long-term investment, we don't know that it wasn't, certainly in light of subsequent events, we can't even say that they were, it wasn't prudent. It might have been foolish to have sold as, I mean, most people who panicked in 2008 and sold during this period of panic, well, the stock market is now back to where it was in, I think the last thing I read was May 2008. And the question of when you measure the damages may very well accommodate that concern, but as the defendants always want to say, we don't look at prudence from the standpoint of hindsight. We look at prudence from the standpoint of the fiduciaries at the time, and what we know is these fiduciaries never... That's where hindsight doesn't help them. Doesn't help them. That's where it doesn't, that's when they say we don't look at it from the standpoint of hindsight. And that's the point. And finally, the last thing I want to say is just because there was some question about this before, I do want to direct the Court to... I want to do it rather quickly. Okay. Can you see that clock? I apologize. The defendants below said very plainly that this plan was not intended to funnel employee investments into company stock, and I think that really does answer the question about encouragement. Thank you. Thank you all very much, Your Honor. Thank both sides for their arguments. The case of Harris v. Amgen, I now submit it for decision.
judges: Korman, Farris, Fletcher